**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

Civil Case No. _____

Thomas Kenjarski, M.D., on behalf
of the United States of America,

Plaintiff/Relator

**FILED UNDER SEAL
JURY TRIAL DEMANDED**

**vs.**

U.S. Anesthesia Partners, Inc.,
U.S. Anesthesia Partners, of Texas, P.A.,
Individually, and/or d/b/a USAP- Texas,
and/or d/b/a Vital Pain Care, and U.S.A.P, LC
Pinnacle Anesthesia Texas, PLLC
Pinnacle Anesthesia Consultants, PLLC
Pinnacle Anesthesia Consultants, P.A.

Defendants

---

# *QUI TAM* COMPLAINT

---

RELATOR THOMAS KENJARSKI, M.D., brings this *qui tam* action in the name of the

United States of America, by and through his undersigned attorneys Christopher A. Payne,

Timothy Robinson, Aaron Robinson, and Christina Alstrin, and alleges as follows:

## SUMMARY INTRODUCTION

1.      This is an action by *qui tam* Relator Thomas Kenjarski, M.D., on behalf of the

United States, against Defendants U.S. Anesthesia Partners, Inc.; U.S. Anesthesia Partners,

of Texas, P.A., Individually, and/or d/b/a USAP- Texas, and/or d/b/a Vital Pain Care and

U.S.A.P, LC; Pinnacle Anesthesia Texas, PLLC; Pinnacle Anesthesia Consultants, PLLC;

and Pinnacle Anesthesia Consultants, P.A. (henceforth collectively referred to as

"USAP/Pinnacle") to recover penalties and damages arising from the Defendants payments

of illegal kickbacks to surgeons/physicians in return for commercial and federal program

patient referrals from the surgeons to Defendants. Specifically, Defendants allowed and/or

encouraged surgeons to create sham anesthesia and/or practice management companies and

permitted and encouraged them to bill and collect for some of USAP/Pinnacle employees'

anesthesia services through the sham entities. In exchange, USAP/Pinnacle received a

kickback in the form of other commercial and federal program patient referrals from the

surgeons to Defendants. In doing so, USAP/Pinnacle and their employees deliberately

circumvented their participation in commercial payer networks so that the surgeons could bill

and collect for Defendants' employees' anesthesia services at out-of-network rates.

Defendants also received additional federal health care program dollars from facilities, paid

in the form of stipends, as an indirect result of kickbacks to the surgeons. This scheme

constitutes multiple violations of the federal Anti-Kickback Statute (*42 U.S.C. 1320a-7b(b)*)

and the False Claims Act, (*31 U.S.C.* §§ 3729 *et seq.*).

2.      Dr. Kenjarski is a board-certified anesthesiologist licensed in the State of Texas

and is a founding member of Noble Anesthesia Partners, PLLC, an anesthesia service provider

which has grown from two active anesthesia providers in 2011, to more than sixty providers today.

Dr. Kenjarski has been actively involved in the provision of anesthesia services in the Dallas/Fort Worth market place for more than fourteen (14) years. As such he has intimate knowledge and understanding of the various attempts by physicians to monetize anesthesia services intended to provide remuneration to surgeons and other physicians for the use of specific anesthesia providers. Dr. Kenjarski has articulated the improper arrangements and the illegal kickbacks being provided to surgeons and other physicians, and despite having informed certain surgeons and/or their representatives of the improper and illegal arrangements, and informing them that these arrangements violate the Federal Anti-Kickback Statute and the False Claims Act, has lost business to the Defendants who actively engage in such illegal practices in order to garner additional business. Having accomplished nothing by informing the surgeons and physicians he now seeks legal redress.

## PARTIES

**3.**     Relator Thomas Kenjarski, M.D. is a citizen of the State of Texas.

**4.**     Defendant U.S. Anesthesia Partners, Inc. is a Delaware corporation incorporated on or about August 13, 2012, and has been registered to do business in the State of Texas since February 24, 2017.  Its principal office is 12222 Merit Drive, Suite 700, Dallas, TX 75251. It can be served with citation through its registered agent, Corporation Service Company, d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

**5.**     U.S. Anesthesia Partners of Texas, P.A. is a Texas Professional Association with its principal office located at 12222 Merit Drive, Suite 700, Dallas, TX 75251. It can be served with citation through its registered agent, Corporation Service Company, d/b/a CSC-

Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701. U.S. Anesthesia Partners of Texas, P.A. conducts business under the assumed names of USAP – Texas as well as under the assumed name Vital Pain Care.

6.      U.S.A.P., L.C. is a Texas Limited Liability Company with its principal place of business located at 2411 Fountainview, Suite 200, Houston, TX 77057. It can be served with citation through its registered agent, Corporation Service Company, d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

7.      Pinnacle Anesthesia Texas, PLLC is a Texas Limited Liability Company with offices located at 500 N. Akard Street, Suite 3100, Dallas, TX 75201-3327. It can be served with citation through its registered agent Wade Emmert at 500 N. Akard Street, Suite 3100, Dallas, TX 75201-3327.

8.      Pinnacle Anesthesia Consultants, PLLC is a Texas Limited Liability Company and is the sole member of Pinnacle Anesthesia Texas, PLLC. It maintains offices at 6606 LBJ Freeway, Suite 200, Dallas, TX 75240-6524 and can be served with citation through its registered agent for service of process Corporation Service Company, d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

9.      Pinnacle Anesthesia Consultants, P.A. is the predecessor in interest to Pinnacle Anesthesia Consultants, PLLC. Pinnacle Anesthesia Consultants, P.A. was a Texas Professional Association which was converted to Pinnacle Anesthesia Consultants, PLLC pursuant to a Certificate of Conversion filed with the Texas Secretary of State's Office on January 6, 2014.

## JURISDICTION & VENUE

**10.** This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* and the Anti-Kickback Statute *42 U.S.C. 1320a-7b(b).*

**11.** This Court maintains subject matter jurisdiction over this action pursuant 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

**12.** Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) One or more of the Defendants transacts business in this district and did so at all times relevant to this complaint; and, as averred below, (ii) One or more of the Defendants committed acts proscribed by 28 U.S.C. § 3729 and/or 42 U.S.C. 1320a-&b(b) — acts giving rise to this action—within this district.

**13.** Before filing this complaint, Dr. Kenjarski served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

**14.** Dr. Kenjarski has complied with all other conditions precedent to bringing this action.

**15.** Dr. Kenjarski is the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the Government before filing this action.

## FACTUAL ALLEGATIONS

**16.** USAP/Pinnacle described itself as, "…the anesthesia leader in the Greater Dallas market and one of the largest physician owned anesthesia practices in the country."

**17.** USAP/Pinnacle was formed over the past approximately 15 years through multiple

mergers of anesthesia groups in the Dallas/Fort Worth area. For example, Pinnacle Anesthesia Consultants, P.A. added a Pain Medicine division and a Pediatric Division and renamed their parent company Pinnacle Partners in Medicine.

18.     In January 2014, Pinnacle Partners in Medicine joined Greater Houston Anesthesiology and Orlando, Florida based JLR Medical Group to form U.S. Anesthesia Partners, bringing together the two largest anesthesia groups in Texas and three of the largest in the country.

19.     USAP/Pinnacle is backed by the capital resources of Welsh, Carson, Anderson and Stowe (320 Park Avenue, Suite 2500, New York, NY 10022-6815). Per www.pinnacleanesthesiamed.com "An elected governing board has overall responsibility for the strategic direction of USAP and is supported by a team of experts in group practice administration, managed care contracting, quality assurance, compliance and risk management."

### HEALTH CARE BENEFIT PROGRAMS

20.     United Healthcare ("UHC") is a health care insurance company that provides health care benefits to individuals enrolled for coverage under individual and group policies.   UHC was at all times during the relevant period, a "health care benefit program" as defined by 18 U.S.C. 24 (b).

21.     Blue Cross Blue Shield of Texas ("BCBS"), like UHC, is a health care insurance company that provided health care benefits to individuals enrolled for coverage under individual and group policies.  BCBS was at all times during the relevant period, a "health care benefit program" as defined by 18 U.S.C. 24 (b).

22.     BCBS, UHC and other non-governmentally operated health care benefit programs are commonly referred to as "commercial payers" and/or "commercial health care programs."

23.     Medicare is a single-payer, national social insurance program administered by the

United States federal government, currently using private insurance companies across the United States under contract for administration. Medicaid is a state based program funded, at least in part, by federal funds. Medicare together with Medicaid, and other governmentally operated health care programs, such as Tri-Care, are commonly referred to as "governmental payers" and/or "federally funded health care benefit programs."

### PROPER BILLING AND CONTRACTING

24.     Health care providers, such as Anesthesiologists and Certified Registered Nurse Anesthetists (CRNAs), sign Employment Agreements with Medical Groups, such as USAP/Pinnacle, to provide anesthesia services on behalf of the Medical Group.  Under the terms of most, if not all, these Employment Agreements, each USAP/Pinnacle anesthesia provider, whether an anesthesiologist or a CRNA, must acknowledge that, during the term of said Employment Agreement, patients (and each patient's applicable health care benefit program) shall only be billed in the name of USAP/Pinnacle for all anesthesia services rendered by the health care provider.  Generally, USAP/Pinnacle is entitled to all fees generated by each such health care provider from or incident to the anesthesia services rendered by the anesthesiologist and/or the CRNA.  In return for their anesthesia services, each USAP/Pinnacle anesthesia provider received a compensation package from USAP/Pinnacle, comprised of a salary and other benefits.

25.     Individuals who purchase healthcare insurance programs typically do so by enrolling in health care benefit programs, such as UHC, BCBS, Medicare, and Tri-Care through an array of plans that vary broadly in costs, coverage, and benefits.  Once enrolled, an individual needing health care services typically pays some deductible or co-pay amount for health care services provided, and the commercial and/or federal health care programs with whom the

individual is enrolled, provides payments for "covered services" to Medical Groups (like USAP/Pinnacle, surgeons, and other health care providers) that participated in the health care benefit program's network ("in-network" benefits). These insurance contracts provide patients with assurances that there will be a limit on the amount of money they must spend on healthcare as provided in their individual and/or group contracts.

26.     Similarly, Medical Groups, such as USAP/Pinnacle, surgeons, and other health care providers enter contractual agreements with commercial health care programs, such as UHC and BCBS, and federal health care programs, such as Medicare, to participate in each health care benefit program's network and gain access to more patients.  These contractual agreements bind all Medical Group providers to participate in the health care benefit program's network, and that all services be provided as in-network services whenever possible. These contractual agreements further require that all providers, including anesthesiologists and CRNAs, provide their services in compliance with the terms and conditions of the network agreements, including that all services be provided as in-network services whenever possible.

27.     Recognizing that not all healthcare providers will, or even can, contract with all commercial payers, and that not all commercial payers want to contract with all healthcare providers for various reasons, most commercial health care benefit programs also provide certain limited benefits pursuant to which they will provide payments for services provided by healthcare providers that do not have a direct contractual agreement with the commercial payer to participate in the payer's network ("out-of-network" benefits).  Typically, the commercial payers out-of-network commercial benefits impose a higher co-pay and/or deductible amount on the patient than when a patient utilizes an in-network healthcare provider. However, many times, the healthcare provider also receives a higher payment from the commercial health care benefit program than it

would receive for such services if the healthcare provider had an in-network contract covering the same services. For instance, for providers that do not contract with UHC, and are outside of their network, UHC typically pays a percentage of billed charges, sometimes 70-90% of billed charges, after the patient meets their annual out-of-network deductible. BCBS typically pays either a percentage of the allowable amount for covered services (e.g. 180% of Medicare) or a percentage of billed charges (after the patient meets their annual out-of-network deductible) for providers that do not contract with BCBS. Out-of-network reimbursements, are often two to three times higher than what providers would have expected to have received from a patient with in-network benefits. However, Medicare, as federally funded health plan, pays the same for services rendered, and does not recognize any distinction between in-network and out-of-network Medical Groups.

28.     When all parties are acting in compliance with the various in-network agreements, the payers such as UHC and BCBS typically pay a lower amount for a covered service, the patient pays a lower deductible and/or co-pay and the healthcare provider(s) receives a lower reimbursement for their services than if the healthcare provided is out-of-network.

29.     The disparity between in-network contract payments and out-of-network payments has the potential to create an incentive to exploit the out-of-network payments, and over the last several years exploitative healthcare providers have attempted to maximize the monetary difference between in-network contract payments and out-of-network payments by utilizing "straw men" or "straw entities" to obtain out-of-network payment amounts even though they are contractually bound to lower rates through in-network contract agreements held by their primary entity. These fraudulent and abusive schemes which attempt to exploit this monetary difference have resulted in multiple attempts by both state and federal authorities to curb out-of-network payments to providers, and/or eliminate out-of-network benefits altogether.

*The Scheme.*

30.     As set forth above, USAP/Pinnacle was formed through multiple mergers of anesthesia groups over the past 15 or so years.  Two of those anesthesia groups that merged into USAP/Pinnacle are known as the Pinnacle North Hills Division ("Pinnacle North Hills") and Pinnacle Arlington Division ("Pinnacle Arlington").

31.     Under the scheme created by USAP/Pinnacle, Pinnacle North Hills and Pinnacle Arlington beginning in late 2012 or early 2013 entered into various Professional Services Agreements with surgeons and/or professional entities owned by surgeons (e.g. a "Billing Company" or "Management Services Organization" hereinafter referred to as SHELLCO).

32.     SHELLCO may be set up in various ways. These various mechanisms/entities, include but are not limited to the following:

- An anesthesia entity set up as a single member professional entity, owned by one surgeon, where the surgeon was responsible for 100% of the referrals;

- An anesthesia entity set up as a single member professional entity, owned by one surgeon, where the surgeon-owner and his/her employed surgeons were responsible for 100% of the referrals;

- An anesthesia entity set up as a professional entity, owned by more than one surgeon, where multiple surgeons are responsible for 100% of the referrals;

- An anesthesia entity set up as a professional entity, owned by one or more physicians, with a syndicated management company owned by surgeons overlaid so those surgeons could be monetized, either over and above fair market value for little to no identifiable management services, and/or sometimes directly based on the volume or value of those surgeons' referrals;

- An anesthesia entity set up as a professional entity, owned by one or more surgeons, and a series LLC management company owned by other surgeons was overlaid so those surgeons could be monetized either over and above fair market value for little to no identifiable management services, and/or sometimes directly based on the volume or value of those surgeons' referrals.

33.     Although USAP/Pinnacle and all its anesthesia providers are contractually bound to provide services to UHC in-network patients at in-network contractually agreed upon rates, the USAP/Pinnacle anesthesia providers circumvented this requirement by providing such anesthesia services under the guise of being an independent contractor to the surgeon owned company, SHELLCO.  Pursuant to this scheme, the USAP/Pinnacle anesthesia provider contracts to provide anesthesia to SHELLCO for a specified monetary amount, and assigns SHELLCO the ability to bill for the anesthesia services under SHELLCO's taxpayer identification number. SHELLCO, which does not have an in-network contract with UHC, then submits the claim for the anesthesia as an out-of-network claim and keeps whatever amount it receives from UHC in excess of the specified monetary amount it agreed to pay to the USAP/Pinnacle anesthesia provider. Through this mechanism USAP/Pinnacle effectively kicks back the excess funds to the surgeon through the surgeon owned entity SHELLCO.

34.     By employing this scheme USAP/Pinnacle knowingly violates the exclusivity requirements contained in the Employment Agreements between the individual anesthesia providers and USAP/Pinnacle which prohibits USAP/Pinnacle anesthesia providers from providing services to any entity other than through USAP/Pinnacle, and further violates the exclusivity requirements set forth in the in-network contracts between USAP/Pinnacle and the commercial and federal health care programs requiring that all anesthesia services provided to

UHC in-network patients be provided at in-network contracted rates.  In return, USAP/Pinnacle receives commercial and federal health care program patient referrals from those same surgeons, as well as an above market hourly cash rate for anesthesia services provided to the surgeon owned entity, SHELLCO. This is a classic "pay to play" kickback scheme which violates state and federal laws.

35.     Segregation of the cases between USAP/Pinnacle and SHELLCO for any given date of service sometimes occurred on a case by case basis. Under these circumstances, the surgeon's scheduler requests anesthesia services from USAP/Pinnacle for a series of patients at a specific facility on a given date. Under the scheme, the surgeon's scheduler also requests anesthesia services from USAP/Pinnacle on behalf of SHELLCO at the same facility on the same date. USAP/Pinnacle assigns an anesthesiologist or CRNA to the surgeon for that day and facility. The anesthesiologist provides the services for all of the surgeon's patients, but allows SHELLCO to bill for certain cases and USAP/Pinnacle to bill for the others. Under this scheme,  a USAP/Pinnacle provider may have been assigned to the facility by Pinnacle North Hills, but may have literally sent the billing records for his/her first case to USAP/Pinnacle to be billed through USAP/Pinnacle's tax ID and subject to USAP/Pinnacle's in-network agreements; the billing records  for his/her second case to a SHELLCO to be billed by SHELLCO as an out-of-network procedure;  and the billing records for his/her third case to USAP/Pinnacle to be billed by USAP/Pinnacle's tax ID and subject to USAP/Pinnacle's in-network agreements, etc.

36.     USAP/Pinnacle then submits in-network claims on behalf of the anesthesiologist for all patients it is designated to bill for in accordance with the terms of the commercial and/or federal payor agreements it has entered into. SHELLCO on the other hand, submits an out-of-network claim on behalf of the anesthesiologist at a rate considerably greater than in-network rates,

and pays the anesthesiologist a flat rate for the services and keeps any funds received from the payor as revenue. A true and correct copy of a draft of such agreement is attached hereto as Exhibit "A" and incorporated herein for all purposes.

37.     To further clarify, Surgeon X's scheduler requests that USAP/Pinnacle anesthesiologist Y provide services for 7 procedures to be conducted by Surgeon X at Facility Z on May 15, 2017. All the patients undergoing procedures are patients who have health care insurance through UHC. USAP/Pinnacle has a contractual agreement with UHC that it must provide anesthesia services to its insureds at specific in-network prices (e.g. $120/unit). SHELLCO has no contractual agreements with UHC. SHELLCO is owned by Surgeon X, and purports to be an anesthesia company. Anesthesiologist Y provides anesthesia services for all the 7 procedures conducted by Surgeon X on May 15, 2017. He turns in his billing information to USAP/Pinnacle for procedures 1, 3, 5, and 7. He receives a salary from USAP/Pinnacle as part of his compensation program and does not receive any of the insurance payments for the anesthesia services provided for these four procedures. USAP/Pinnacle receives all the insurance payments. However, for procedures 2, 4 and 6, anesthesiologist Y purports to be an independent contractor who provides services to SHELLCO. He may receive an hourly amount, a flat amount per procedure, or a per diem amount for his services to SHELLCO that day. Dr. Kenjarski is familiar with at least one USAP/Pinnacle arrangement where Anesthesiologist Y received an hourly rate of $700.00 for the three procedures. This equates to a $5,600.00 per diem rate or an annualized compensation of $1,000,000.00, well above fair market value for an anesthesiologist in the Dallas/Ft. Worth area. This is an incentive for USAP/Pinnacle to agree to such a scheme because it exceeds the usual and customary fees received daily by the typical USAP/Pinnacle anesthesiologist in the Dallas/Ft. Worth area. Anesthesiologist Y then turns the billing information for the three procedures over to

SHELLCO which then bills UHC as an out-of-network anesthesia provider. SHELLCO bills UHC at a rate that ensures that even with a 70% payment by UHC that it will make more than what it paid to anesthesiologist Y.  UHC pays 70% of the billed charges, and SHELLCO, the company owned by Surgeon X, keeps as its profit all funds in excess of what it paid to anesthesiologist Y. This also incentivizes Surgeon X to have USAP/Pinnacle provide anesthesia for all his procedures, including Medicare funded procedures, at all facilities where he conducts surgeries and thereby expands USAP/Pinnacle's business reach.

38.    More insidious is the fact the monetization of anesthesia leads surgeons to influence the RFP process at hospitals, especially when the surgeons served the hospital in an administrative capacity, and exclusive contracts with significant stipends comprised in part by federal health care program dollars may have been awarded to USAP/Pinnacle as a result of the kickbacks to those surgeons. The USAP/Pinnacle scheme provides surgeons with a financial incentive to begin to work or continue working exclusively with USAP/Pinnacle anesthesia providers.

39.    Additional inducements may have been provided by USAP/Pinnacle's Pain Management Division providers, who participated in the scheme by serving as the anesthesia providers for the surgeons who participated in the scheme and/or leasing unnecessary pain management clinic office space from surgeons for above fair market value rates.

40.    All this is possible because the healthcare system is dependent upon the integrity of the healthcare providers and does not have any type of verification system built into the physician billing system up front. That is, UHC and ALL commercial and federal payers rely on the provider(s) to submit true and accurate claims.  All USAP/Pinnacle providers were required to submit claims for covered services through the terms of their UHC/USAP Medical Group Agreement. Additionally, UHC and ALL commercial and federal payers rely on the provider(s) to

collect each patient's out-of-network deductible.  Although SHELLCO was required to collect each patient's out-of-network copay and deductible, due to the fact that out-of-network copays and deductibles are more expensive, Dr. Kenjarski, based upon information and belief, suspects that SHELLCO may have waived some or all of the patients' out-of-network copays and deductibles so as not to upset the patients, thus providing an inducement for patients to accept out-of-network services from SHELLCO instead of demanding in-network services from USAP/Pinnacle.  Since most, if not all, surgeons participating in SHELLCO submitted claims for their own surgical professional fees in-network, and collected an in-network co-pay and deductible from the patient for the surgeon's claim(s), it is highly unlikely that the surgeon would also attempt to collect the full out-of-network copay and deductible for SHELLCO's anesthesia services.

41.     A variance on the scheme is that instead of Surgeon X being an owner of SHELLCO, Surgeon X captures the anesthesia revenue by being paid a management fee for services that were not readily identifiable and/or may have been paid a management fee that significantly exceeded fair market value.  This has been described as an "MSO Model," whereby the surgeon or surgeons were not necessarily owners of SHELLCO, but the surgeons were owners of a management company or series entity of a management company that provided management services to SHELLCO, at least on paper.  In the MSO Model, surgeons were either paid management fees over and above fair market value for little to no identifiable management services, and/or paid on a metric directly based on the volume or value of those surgeons' referrals.

42.     The funds that Surgeon X receives, whether through ownership of SHELLCO or through illusory consulting and/or management fees are significant enough that surgeons have steered their referrals away from other anesthesia providers to USAP/Pinnacle when their legacy anesthesia providers refused to match the deal or cried foul.

43.     There are at least two persons/entities that suffer economic harm under the USAP/Pinnacle scheme. First, UHC pays far more than it would if the anesthesia services were billed at the contractual rates set forth in its agreements with USAP/Pinnacle. Second, if SHELLCO causes the patient to pay the additional deductibles/co-pays associated with the out-of-network costs then they are paying more than they are contractually bound to pay. On the other hand, if SHELLCO is not attempting to collect the applicable deductible or co-pay it is providing an inducement and engaging in an additional form of fraudulent billing.

44.     The example above utilizes UHC as the commercial payor. That is because it appears that most such cases involving SHELLCO are UHC cases. The fact that UHC patients are singled out is not a coincidence.  UHC typically pays 70-90% of billed charges (after the patient meets their annual out-of-network deductible) to Medical Groups like SHELLCO when their anesthesia providers are out-of-network with UHC. Thinly veiled attempts to separate a surgeon's cases into two different operating rooms (a USAP/Pinnacle room and a SHELLCO room) at the same facility on the same date of service staffed by two USAP/Pinnacle providers cannot provide USAP/Pinnacle and/or SHELLCO with any safe harbor as each anesthesia provider is contractually obligated to USAP/Pinnacle pursuant to their Employment Agreements to provide such services exclusively through USAP/Pinnacle and only on an in-network basis through the USAP/Pinnacle contractual agreements with UHC and other payers.

45.     Despite deliberate efforts to fit SHELLCO into one or more safe harbors, it is impossible for USAP/Pinnacle to deny that but for their engagement with SHELLCO, USAP/Pinnacle would have been providing anesthesia services for their own account.  These services would have been provided at an in-network rate, through USAP's taxpayer id number. The fact that Pinnacle North Hills and Pinnacle Arlington have been in existence for more than 15

years supports the fact that there is no commercially reasonable need for Surgeon X to create a new anesthesia practice like SHELLCO (especially within the last few years) and staff it with the same Pinnacle North Hills and/or Pinnacle Arlington providers except to kickback to Surgeon X funds derived from USAP/Pinnacle anesthesia providers' anesthesia services in return for other commercial and federal health care program patient referrals to USAP/Pinnacle.

46.     Surgeon owned companies like SHELLCO must be commercially reasonable and serve a legitimate business purpose.  To be considered commercially reasonable and serving a legitimate business purpose, SHELLCO must meet one of two criteria. Specifically, SHELLCO must either (1) employ anesthesia providers, and/or (2) employ others who provide identifiable anesthesia practice management services at fair market value for the entity.  In most of the SHELLCO schemes, SHELLCO does not employ anesthesia providers. SHELLCO must therefore employ others who provide identifiable anesthesia practice management services at fair market value to SHELLCO to meet the test. Under most if not all the SHELLCO schemes, SHELLCO outsources its anesthesia practice management services to a third party and/or utilized employees of the surgeon's practice to perform anesthesia practice management duties (e.g. scheduling).

47.     While nothing prevents an anesthesia provider from being credentialed by more than one entity at the same time (e.g. USAP/Pinnacle and SHELLCO), USAP/Pinnacle cannot reasonably argue that the services being provided to SHELLCO by the Pinnacle North Hills of USAP/Pinnacle were "moonlighting" efforts performed by off-duty USAP/Pinnacle anesthesiologists who needed a second job with SHELLCO, particularly when the anesthesia provider was splitting multiple cases covered by commercial payers between SHELLCO and USAP/Pinnacle on the same day and at the same facility.

48.     Knowledge of this scheme is not limited to just the Pinnacle North Hills Division

and the Pinnacle Arlington Division of USAP. The Miscellaneous Provisions section in the Professional Services Agreements between one such SHELLCO and USAP/Pinnacle obtained by Dr. Kenjarski, specified that notices be sent to the Pinnacle Anesthesia Consultants, P.A./USAP Corporate Office (13737 Noel Rd, Suite 1400, Dallas, TX 75240) to the attention of the "Chief Executive Officer."   Clearly, USAP/Pinnacle's corporate office knew about these schemes, and USAP/Pinnacle executives waived the exclusivity provisions of the USAP/Pinnacle Employment Agreement(s) with its anesthesia providers for the sole purpose of providing an inducement to SHELLCO for commercial and federal program patient referrals.   USAP/Pinnacle's corporate office and executives also deliberately circumvented the provisions of USAP/Pinnacle's Medical Group Agreements with payers to permit SHELLCO to receive fraudulently claimed out-of-network dollars.

49.     This is not the first time USAP/Pinnacle has been accused of misrepresenting the status of their providers as being in-network.   Pinnacle unlawfully dismissed one of their anesthesiologists in 2004 after he voiced concerns that the group practice was billing patients at out-of-network rate, while claiming to be in-network for the major health plans carried by the hospital with which it contracted. (See Cause No 05-07-01042 CV; *Pinnacle Anesthesia Consultants, PA v Dr. Neal Fisher* in the 5th Court of Appeals for the State of Texas)

### COUNT I:  Violations of the False Claims Act

50.     Each of the foregoing allegations is realleged and incorporated hereby.

51.     As described in this Qui Tam Complaint, Defendants USAP/Pinnacle, by and through its officers, agents, and employees have since late 2012 or early 2013: (i) knowingly presented, or caused to be presented, to the United States Government, to state Medicaid payors, and/or commercial payors, a false or fraudulent claim for payment or approval; (ii)

knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government, state Medicaid payors, and/or commercial payors; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government, state Medicaid payors, and/or commercial payors.

52. Defendants authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

53. The United States Government and the public, together with state Medicaid systems and/or commercial payors, have been damaged because of the Defendants' violations of the False Claims Act.

54. Dr. Kenjarski requests a jury trial on all issues so triable.

**COUNT II:  Violations of the Anti-Kickback Statute**

55. Each of the foregoing allegations is realleged and incorporated h e r e b y .

56. As described in this Qui Tam Complaint, Defendants USAP/Pinnacle, by and through its officers, agents, and employees beginning in late 2012 or early 2013: (i) knowingly and willfully solicited and received a bribe, kickback and/or rebate in cash or kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of an item or service for which payment was made in whole or in part under a Federal health care program, or to purchase, lease, order, or arrange for or recommend

purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program; (ii) ) knowingly and willfully offered and/or paid kickbacks, bribes, and/or rebates in cash or kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of an item or service for which payment was made in whole or in part under a Federal health care program or to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program; Each of these acts or omissions constitute forbidden "pay to play" schemes in violation of the Anti-Kickback Statute.

57.     Defendants authorized and ratified all the violations of the Anti-Kickback Statute committed by its various officers, agents, and employees.

58.     The United States Government and the public, together with state Medicaid systems and/or commercial payors, and Dr. Kenjarski have been damaged because of the Defendants' violations of the Anti-Kickback Statute.

59.     Dr. Kenjarski requests a jury trial on all issues so triable.

60.     WHEREFORE, Relator Thomas Kenjarski, M.D., on behalf of himself and the United States Government, prays:

(i)     that this Court enter a judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the False Claims Act;

(ii)     that this Court enter a judgment against Defendants for a civil penalty of

$10,000 for each of Defendant's violations of the False Claims Act;

(iii)    that Relator Thomas Kenjarski, M.D., recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(iv)    that Relator, Thomas Kenjarski, M.D., be awarded all reasonable attorneys' fees in bringing this action;

(v)    that in the event the United States Government proceeds with this action, Relator Thomas Kenjarski, M.D., be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

(vi)    that in the event the United States Government does not proceed with this action, Relator Thomas Kenjarski, M.D. be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

(vii)    that Relator Thomas Kenjarski, M.D. be awarded prejudgment interest;

(viii)    that a trial by jury be held on all issues so triable; and

(ix)    that Relator Thomas Kenjarski, M.D. and the United States of America receive all relief to which either or both may be entitled at law or in   equity.

Respectfully Submitted,

**PAYNE ROBINSON, L.L.P.**


/s/ Christopher A. Payne
Christopher A. Payne

Texas State Bar No. 15651500
Chris.Payne@PayneRobinson.com
Tim Robinson
Texas State Bar No. 17115450
Tim.Robinson@PayneRobinson.com
Christina Alstrin
Texas State Bar No. 24068019
Christina.Alstrin@PayneRobinson.com
Aaron Robinson
Texas State Bar No. 24085705
Aaron.Robinson@PayneRobinson.com
9101 LBJ Freeway,
Suite 760
Dallas TX 75243
Telephone: (214) 945-1022
Facsimile: (214) 945-1023

**Attorneys for Relator Thomas Kenjarski, M.D.**